**NUTRIVIDA, INC.**
**Plaintiff/Counterdefendant,**

v.

**INMUNO VITAL, INC. and Andres Garcia Garcia, Defendants/Counterclaimants.**

No. 95–2250–Civ.

United States District Court,
S.D. Florida.

Dec. 6, 1998.

Robert Martin Schwartz, Miami, FL, Gonzalo Ramon Dorta, Gonzalo R. Dorta, P.A., Coral Gables, FL, Amy B. Goldsmith, James Reisman, Gottlieb Rackman & Reisman PC, New York City, for plaintiff.

Jeffrey David Feldman, James Anthony Gale, Komal H. Bhojwani, John C. Carey, Feldman Gale & Weber, Miami, FL, Jeffrey M. Kaden, Gottlieb Rackman & Reisman PC, New York City, for Inmuno Vital, Inc., defendant.

Juan Jose Rodriguez, Rodriguez & Machado, Miami, FL, for Andres Garcia Garcia, defendant.

## MEMORANDUM OPINION

TURNOFF, United States Magistrate Judge.

On June 10, 1996, all proceedings in this action were referred to this Court pursuant to 28 U.S.C. § 636 and by consent of the parties. On February 28, 1997, this Court granted summary judgment as to liability in favor of Inmuno Vital, Inc. ("Inmuno Vital") under Count VIII of Inmuno Vital's Amended Counterclaim, and dismissed Counts IV and VI of the Second Amended Complaint filed by Nutrivida, Inc. ("Nutrivida"). Based upon the entry of partial summary judgment, a preliminary injunction was entered against Nutrivida on March 5, 1997. The case was also set for trial in March 1997; however, on or about the eve of trial, Nutrivida filed a voluntary petition for bankruptcy which stayed this matter pursuant to 11 U.S.C. § 363. Thereafter, the bankruptcy matter was dismissed, and this action reset for further proceedings. Subsequent to the bankruptcy dismissal, Nutrivida's counsel withdrew from their representation in this matter. In light of Nutrivida's failure to thereafter obtain new counsel or to otherwise prosecute this action, this Court on July 20, 1998 granted default judgment as to liability in Inmuno Vital's favor under each of the remaining counts in Inmuno Vital's Amended Counterclaim, and dismissed each of Nutrivida's affirmative claims for relief with prejudice.[1] On October 23, 1998, this Court held a hearing to determine the monetary damages to be awarded Inmuno Vital under its Counterclaims.[2] The rulings made herein by the Court thus bring this matter to an end.

## I. INTRODUCTION

This action involves the unauthorized and infringing use by Nutrivida of three forms of Inmuno Vital's intellectual property: (1) Inmuno Vital's exclusive right to use the name, likeness and image of its celebrity endorser Andres Garcia in the commercial promotion of cat's claw products, (2) Inmuno Vital's exclusive right to use the name "Oscar Schuler Egg" in the commercial promotion of cat's claw products, and (3) Inmuno Vital's distinctive Seal Design used on the packaging of cat's claw products.[3]

1. As stipulated to the Court by their respective counsel, Nutrivida and Andres Garcia Garcia have settled their claims against one another.

2. Though notice of the hearing was timely provided to Nutrivida by certified and regular mail at its principal place of business, Nutrivida failed to appear.

3. The relevant pleading is Inmuno Vital's Amended Answer, Affirmative Defenses and Counterclaim filed on September 19, 1996. Counts I–III arise under the Lanham Act, 15 U.S.C. § 1125(a), and state claims for trade-

mark infringement related to Nutrivida's use of a seal design identical to or at least confusingly similar to Inmuno's. Count IV also arises under the Lanham Act, 15 U.S.C. § 1125(a), but relates to Nutrivida's unauthorized and misleading use of Andres Garcia's name, likeness and image. Count V arises under Section 495.161 of the Florida Statutes and states a claim for common law trademark infringement and unfair competition relating to Nutrivida's use of a seal design identical to or at least confusingly similar to Inmuno's. Count VI arises under Section 501.201 of the Florida Statutes and states a claim for decep-

The extent to which Nutrivida has unjustly profited from its infringing conduct—as revealed by its own business records—is significant. From July 1995 through February 1997, the relevant period of infringement, Nutrivida generated profits of more than $12 million on sales of approximately 540,000 bottles of cat's claw. Under the governing legal authorities and the circumstances of this case, Inmuno Vital is entitled to the disgorgement of Nutrivida's ill-gotten gains as compensation for Nutrivida's acts and to deter similar acts of unjust enrichment in the future. Moreover, based on the knowing and continuing nature of Nutrivida's infringement for almost two years after receipt of a cease and desist letter, punitive damages and an award of attorneys' fees are warranted by applicable law.

## II. FACTUAL BACKGROUND

Inmuno Vital manufactures and distributes on a nationwide and international basis a product known as "cat's claw," which derives from a plant native to the jungles of South America.[4] Cat's claw is sold in capsule form by both Inmuno Vital and Nutrivida.

Andres Garcia Garcia is an internationally renowned actor residing in Mexico City. At various times throughout 1994 and 1995, Garcia publicly credited his use of cat's claw, specifically the brand sold by Inmuno Vital, with curing him of prostate cancer. Moreover, by written agreement dated September 1994, Garcia granted Inmuno the exclusive right to make use of his name in the promotion of cat's claw products. Specifically, the license agreement states:

"Andres Garcia grants to Inmuno Vital, Inc. the *exclusive* right with licensing rights to use his name on any product containing any form of Cat's Claw (Uncaria Tomentosa)."

Garcia has also acknowledged that this grant to Inmuno extended to use of his photograph and likeness, as well as his name.

From September 1994 through 1996, Inmuno Vital used Garcia's name and likeness in extensive Spanish-language print and television advertising for Inmuno's Vida Vital brand of cat's claw. From the latter part of 1994 through August 1995, Inmuno's advertising for its Vida Vital brand cat's claw generated average monthly sales of approximately 50,000 bottles. By virtue of Inmuno's extensive advertising using the name, photograph and likeness of Andres Garcia, the consuming public came to associate the name and likeness of Andres Garcia with Inmuno and its Vida Vital brand of cat's claw. Moreover, In-

---

tive and unfair trade practices relating to the acts of Nutrivida in infringing Inmuno's seal design. Count VII arises under Section 817.41 of the Florida Statutes and states a claim for false advertising relating to Nutrivida's use of a false or misleading seal design. Count VIII arises under New York Civil Rights Law §§ 50 and 51 and states a claim for misappropriation of Inmuno's exclusive right of publicity with respect to the name, likeness or image of Andres Garcia. Count IX arises under New York Civil Rights Law §§ 50 and 51 and states a claim for misappropriation of Inmuno's exclusive right of publicity with respect to the name of Oscar Schuler Egg. Count X arises under the common law of Florida and states a claim for Nutrivida's tortious interference with Inmuno's exclusive contractual rights to the Oscar Schuler Egg name and the name, likeness and image of Andres Garcia. Count XI arises under the Lanham Act, 15 U.S.C. § 1125(a), and states a claim for unfair competition relating to Nutrivida's various and combined acts of infringing Inmuno's rights to the seal design, the Oscar Schuler Egg name, and the name, likeness and image of Andres Garcia. Count XII arises under the common law of Florida and states a claim for unjust enrichment relating to Nutrivida's various and combined acts of infringing Inmuno's rights to the seal design, the Oscar Schuler Egg name, and the name, likeness and image of Andres Garcia. Finally, Count XIII arises under Section 495.161 of the Florida Statutes and states a claim for dilution of Inmuno's trademark rights in the seal design.

4. The name for cat's claw in Spanish is "una de gato." The plant's scientific name is uncaria tomentosa.

muno's use of the name and likeness of Andres Garcia in its advertising for Vida Vital cat's claw distinguished Inmuno's product from the products of other competitors.

Apart from the use of the Garcia name and image, and pursuant to an exclusive license and distributorship agreement between Inmuno and non-party Tracker, S.A., from about March 1994 to July 1995, Inmuno's packaging of its bottles of Vida Vital cat's claw also bore the name "Oscar Schuler Egg Certified." Oscar Schuler Egg is the supposed discoverer of cat's claw, and his heirs' Peruvian company (Tracker, S.A.) was for a time Inmuno's supplier of ground cat's claw root.

Nutrivida, located in Brooklyn, New York, is a nationwide distributor of various vitamin products and nutritional supplements. By letter agreement dated February 24, 1995, Nutrivida and Inmuno entered into a "private label" arrangement whereby Inmuno agreed to package, bottle and label its Vida Vital cat' claw product with Nutrivida's name on the label for distribution and re-sale by Nutrivida. Under this February 24, 1995 private label agreement, Inmuno also granted Nutrivida, for the term of the agreement, the right to use the name "Oscar Schuler Egg" on Nutrivida's cat's claw (which in reality was merely Inmuno's Vida Vital in a Nutrivida-labeled bottle). Inmuno did not, however, grant Nutrivida by means of the private label agreement the right to use the name or likeness of Andres Garcia to promote any of Nutrivida's products, including the product produced for Nutrivida under the private labeling agreement described above.

From at least as early as July 1995, and until preliminarily enjoined by this Court in February 1997, it is uncontroverted that Nutrivida nevertheless produced and caused to be broadcast on the Spanish-language television network Telemundo, television commercials and "infomercials" containing the name, photograph and likeness of Andres Garcia. To also promote its competing uña de gato product, Nutrivida distributed flyers which contain the name and likeness of Andres Garcia.

Upon first becoming aware of Nutrivida's commercials using Garcia's name and likeness in about July 1995, Inmuno's Dexter Backus and Cecilia Iturriaga contacted Nutrivida's Dr. Norma Pestano to object to Nutrivida's commercial advertising campaign and to insist that Nutrivida stop using Garcia's name and likeness. Also in July 1995, Inmuno advised Nutrivida that it could no longer supply cat's claw product with the name "Oscar Schuler Egg," but it could continue to supply Vida Vital using cat's claw product from another source. Nutrivida declined this offer, and instead withheld payment from Inmuno for shipments already received by Nutrivida. The parties then terminated their relationship by agreement dated August 2, 1995. All business relations between Nutrivida and Inmuno ceased as of that date.

In August 1995, Nutrivida was twice warned in writing to cease and desist from airing television commercials containing Andres Garcia's name, photograph or likeness. Notwithstanding its receipt of the cease and desist letters, it is undisputed that Nutrivida continued to use the name, photograph and likeness of Andres Garcia in its commercial television advertising until enjoined from doing so by this Court in February 1997.

It is clear that because both Inmuno and Nutrivida used the name and likeness of Andres Garcia in the promotion of their respective cat's claw products, consumers of cat's claw products were confused and deceived regarding which source of cat's claw Andres Garcia actually endorses and promotes. Moreover, the Court finds that not only has Nutrivida profited substantially from its improper use of the name and likeness of Andres Garcia, such acts have caused damage to Inmuno Vital's sales, its reputation and its goodwill with the consuming public.

## III. COMPENSATORY DAMAGES

Monetary recovery for violations of the Lanham Act, 15 U.S.C. § 1125(a), is provided for by 15 U.S.C. § 1117. Pursuant to Section 1117, Inmuno Vital is entitled to recover: (1) Nutrivida's profits, (2) any damages sustained by Inmuno, and (3) costs of the action. The Court has wide discretion in assessing these damages, which may be awarded even when they are not susceptible to precise calculations. *Ramada Inns, Inc. v. Gadsden Motel Company,* 804 F.2d 1562, 1564–65 (11th Cir.1986).

In this case, Inmuno Vital has elected to recover and has introduced evidence regarding the profits made by Nutrivida on infringing sales of cat's claw product. An award of an infringer's profits has traditionally been viewed under the Lanham Act and the common law of unfair competition as a way of compensating the plaintiff for sales lost to the infringer. As stated by one court in a case where, like here, the parties were direct competitors, "[t]he defendant's profits ... are a rough measure of the plaintiff's damages. Indeed, they are probably the best possible measure of damages available." *Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 149 (4th Cir.1987). Additionally, awards of an infringer's profits have been recognized not merely as a surrogate for a plaintiff's actual lost sales, but as compensation for the defendant's unjust enrichment. As the Eleventh Circuit held in the leading case of *Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir.1988):

> An accounting for profits has been determined by this Court to further the congressional purpose by making infringement unprofitable and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future.

Significantly, the Court in *Burger King* also held that an award of profits need not be based on a high showing of the infringer's culpability, but rather that such an award is appropriate against a defendant who is "purposely" infringing. 855 F.2d at 781. *See also Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.,* 833 F.2d 1484, 1488 (11th Cir.1987) (reversing a denial of profits and noting that a plaintiff need not prove actual damages in order to obtain an accounting of an infringer's profits). Apposite here is the case of *Winterland Concessions Co. v. Fenton,* 835 F.Supp. 529 (N.D.Cal.1993), where the holders of exclusive licenses to sell products exhibiting pictures of popular music artists were awarded disgorgement of defendant's profits under their Lanham Act claim against the defendant, and received a punitive damages award under their California right of publicity claim.

In assessing the amount of an infringer's profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *See* 15 U.S.C. § 1117(a). The Lanham Act thus squarely places the burden of proof on the infringer to establish any deductions from its gross sales in order to arrive at the correct profit figure. Moreover, under the Lanham Act and the common law, it is the infringer's burden to prove any proportion of its total profits which may not have been due to the infringement. *See* J. Thomas McCarthy, *Trademarks and Unfair Competition* § 30:65 (4th ed.1998). *See also Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U.S. 251, 261, 36 S.Ct. 269, 272, 60 L.Ed. 629 (1916) (an infringer cannot take advantage of its own wrong; plaintiff carries its burden of proof when it shows the extent of defendant's total sales); *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942) ("There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."). Thus, "the plaintiff need only prove gross sales and then it is up to the infringer to prove which, if

any, of those sales were not attributable to the wrongful act, and deductible costs and expenses to arrive at net profits." J. Thomas McCarthy, *Trademarks and Unfair Competition* § 30:66 (4th ed.1998). Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party. *Id.* (citing *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985)).

■ Based on the evidence adduced in this case, this Court finds that Nutrivida was unjustly enriched by its purposeful and knowing use of the name, likeness and image of Andres Garcia in marketing cat's claw product. Because the purpose of Section 1117 is to "take all the economic incentive out of trademark infringement," *Winterland Concessions*, 835 F.Supp. at 532 (citations omitted), the Court therefore concludes that an award of Nutrivida's profits is strongly warranted under the circumstances of this case.

With respect to the calculation of the amount of profits, Inmuno Vital has produced evidence, in the form of Nutrivida's own sales records, of Nutrivida's gross sales of cat's claw for the period of infringement July 1995 through February 1997 in the amount of $17,258,871. The same records demonstrate that Nutrivida's gross profits on those sales were $12,524,-111[5]. Though Inmuno Vital has pointed out that some evidence of potentially deductible expenses appears in the record, namely in the form of advertising invoices and unsubstantiated deposition testimony from a Nutrivida witness regarding advertising and telemarketing expenses, there is no evidence in the record as to whether or to what extent Nutrivida actually paid such invoices or incurred such expenses. *See Bambu Sales, Inc. v. Ozak Trading*

*Inc.*, 58 F.3d 849, 854 (2d Cir.1995) (evidence of bills without documentary evidence that the bills were in fact paid is not proof of deductible costs). However, insofar as the Court presumes that *some* advertising and telemarketing costs were necessarily incurred, the Court will deduct $1,000,000 for advertising costs, and an additional $1,000,000 for telemarketing expenses from the total amount Inmuno Vital recovers.[6] Accordingly, the Court will award Inmuno Vital $10,524,111 of Nutrivida's profits as compensatory damages.[7]

## IV. PUNITIVE DAMAGES

■ The Court has found that Nutrivida's actions were done knowingly, deliberately and intentionally after receiving a cease and desist letter demanding that such actions stop. Under New York Civil Rights Law §§ 50 and 51, punitive damages are appropriate where the defendant's actions were committed "knowingly." *Welch v. Mr. Christmas Inc.*, 57 N.Y.2d 143, 150, 454 N.Y.S.2d 971, 440 N.E.2d 1317, 1321 (1982) ("For recovery of exemplary damages under the statute, therefore, no more need be shown than knowing use.") (punitive damages award to professional actor of 15 times compensatory damages upheld on appeal). Additionally, punitive damages may be awarded under the statute even though there is no award of compensatory damages. *Cappetta v. Lippman*, 913 F.Supp. 302, 306 n. 4 (S.D.N.Y.1996).

This Court cannot allow Nutrivida's intentional conduct to go unpunished. Moreover, the Court is concerned that the foregoing compensatory damages award may still leave Nutrivida unjustly enriched and therefore undeterred. That is because (1) it appears obvious from Nutrivida's sales records that Nutrivida's improp-

---

**5.** This figure was derived from Nutrivida's own profit reports. *See* Depo. of Frank Huerta, Exhs. 23–24.

**6.** This amount is consistent with Inmuno Vital's recommendation at oral argument, as well as the Court's own review of the record.

**7.** Compensatory damages are available under Counts I–IV and VIII–XIII of Inmuno Vital's Amended Counterclaim. Because recovery under each of the counts separately would be cumulative, this single damages award is made applicable to all counts.

er use of Andres Garcia's name and image in advertising cat's claw products had a positive "spill-over" effect on Nutrivida's nutritional supplement and vitamin products; and (2) it appears equally obvious that Nutrivida's improper use of Andres Garcia's name and image continued to positively affect sales for some period of time even after such use stopped in February 1997.[8] Lastly, Nutrivida must be put on notice that it costs less to obey the laws than to violate them. Accordingly, in light of the substantial revenues made by Nutrivida on cat's claw sales as well as across its entire line of products, this Court determines that a punitive damages award of $1,500,000[9] is necessary to punish Nutrivida for the willful nature of its misappropriation of Inmuno Vital's rights.[10]

## V. PREJUDGMENT INTEREST

■ The purpose of prejudgment interest is to compensate the plaintiff for "the foregone use of the money between the time of infringement and the date of the judgment," *General Motors Corp. v. Dervex Corp.*, 461 U.S. 648, 656, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), and to place the plaintiff "in the situation [it] would have occupied if the wrong had not been committed." *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1574

(Fed.Cir.1988) (patent case). In Lanham Act cases, prejudgment interest is available in the Court's discretion to successful plaintiffs. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 437 (7th Cir.1989) (noting that without an award of prejudgment interest compensation of the plaintiff is incomplete and defendant has an incentive to delay).

■ This Court finds that an award of prejudgment interest is warranted by the circumstances of this case, including the fact that this action was stayed for more than a year due to Nutrivida's voluntary filing of a petition for bankruptcy reorganization on the eve of trial, which it subsequently voluntarily dismissed. The Court further decides to follow those case which have selected the prime rate of interest, compounded quarterly, to assess the amount of interest. *See Studiengesellschaft Kohle m.b.H. v. Dart Industries*, 666 F.Supp. 674, 697–99 (D.Del.1987), *affirmed*, 862 F.2d 1564 (Fed.Cir.1988); *Scott Paper Co. v. Moore Business Forms, Inc.*, 594 F.Supp. 1051, 1083 (D.Del.1984).

The following chart demonstrates the calculation of prejudgment interest on Nutrivida's monthly cat's claw profits during the relevant period of infringement:[11]

| DATE | PROFITS TO DATE | RATE | INTEREST TO DATE |
|------|-----------------|------|------------------|
| 7–95 | N/A | 8.75% | N/A |
| 12–20–95 | $ 3,246,055.84 | 8.50% | $ |
| 2–1–96 | $ 4,746,687.55 | 8.25% | $ |
| 3–26–97 | $10,524,111.00 | 8.50% | $ |
| 9–30–98 | $10,524,111.00 | 8.25% | $2,458,499.79 |

8. Moreover, as Inmuno Vital pointed out at oral argument, punitive awards are usually non-dischargeable in bankruptcy. To the extent that Nutrivida might once again file bankruptcy, a punitive award may be all that Inmuno Vital will ultimately recover.

9. Immuno Vital has suggested an award of $3,000,000 at oral argument.

10. This punitive damages award is made under Count VIII of Inmuno Vital's Amended Counterclaim, the claim for which Nutrivida's liability was established on summary judg-

ment. New York law is applicable here pursuant to this Court's October 17, 1996 decision on choice-of-law issues.

11. The following formula was employed to perform this calculation: Present Value = $(1 + I)^n$ where I equals the interest rate and n equals the number of compounding periods. Interest was calculated compounded quarterly based on the prime rate from the month the profit figure was reported through the end of November 1998. Source of the prime rates is NationsBank.

| 10–16–98 | $10,524,111.00 | 8.00% | $2,504,676.46 |
|----------|----------------|-------|----------------|
| 11–30–98 | $10,524,111.00 | 8.00% | $2,607,109.00 |

As discussed above, the Court has deducted $2,000,000.00 in expenses from the gross profits generated by Nutrivida during the period of infringement. For the purposes of this prejudgment interest calculation, these expenses have been subtracted in an amount proportional to each month's profits. In other words, since the total deduction of $2,000,000.00 is 16% of the $12,524,111.00 total gross profits amount, each monthly gross profits figure was reduced by 16% for the purpose of calculating the prejudgment interest accrued during that month.

Accordingly, the Court awards $2,607,-109 in prejudgment interest to Inmuno Vital.

## VI. ATTORNEYS' FEES AND COSTS

■ As the prevailing party, Inmuno is entitled to an award of attorneys' fees under Florida's Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.2105 and under the Lanham Act, the latter of which provides for such an award in "exceptional cases." 15 U.S.C. § 1117. Intentional, deliberate or willful conduct is usually sufficient to make out an "exceptional case." *See, e.g., Playboy Enterprises, Inc. v. P.K. Sorren Export Co.,* 546 F.Supp. 987, 999 (S.D.Fla.1982) (attorneys' fees awarded where infringement was deliberate); *Amana Soc. v. Gemeinde Brau, Inc.,* 417 F.Supp. 310 (N.D.Iowa 1976), *affirmed,* 557 F.2d 638, 639 (8th Cir.1977), *cert. denied,* 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977) (attorneys' fee award where defendant proceeded to use mark after being denied permission); *O'Brien Intern., Inc. v. Mitch,* 209 U.S.P.Q. 212, 217, 1980 WL 30251 (N.D.Cal.1980) (continuation of infringement after notice); *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* 634 F.Supp. 990, 999 (W.D.Mo.1986) (deliberate and intentional infringement makes the case "exceptional").

■ In the instant case, Nutrivida continued to utilize the name, likeness and image of Andres Garcia for one and a half years after receiving a cease and desist letter demanding it to stop. Under the foregoing authorities, such deliberate, knowing and intentional infringement warrants a determination that this case is "exceptional" for purposes of determining Inmuno's entitlement to an attorneys' fee award under the Lanham Act.

■ To determine the amount of fees, this Court is to apply the "lodestar" approach set forth in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and *Norman v. The Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir.1988). To arrive at the lodestar amount, the Court is required to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate for the services of the prevailing party's attorney. *Norman,* 836 F.2d at 1299. Once the Court arrives at the lodestar figure, it may be adjusted according to whether the results were excellent, whether the fee was fixed or contingent, and other factors. In intellectual property cases, other courts have held that "a party should be entitled to retain the most competent counsel available" because the issues are difficult and require great skill and experience on the part of the attorneys. *Howes v. Medical Components, Inc.,* 761 F.Supp. 1193, 1196, 1199 (E.D.Pa.1990).

■ Here, Inmuno Vital has presented evidence sufficient to show the experience of its attorneys, their average hourly billing rate in this case, the total number of hours expended with detailed descriptions of the nature of the work performed, and comparable hourly rates and total litigation expenses for trademark infringement cases in this geographic area. In view of these submissions, the Court finds that the total hours expended on this case by Inmu-

no Vital's attorneys through the end of July 1998, 1498 hours, was both reasonable and necessary, especially in view of the tasks performed by Inmuno Vital's counsel over the three-year pendency of this action. The Court also finds that the average hourly rate, $127.48 as reflected in the submissions by Inmuno Vital, was reasonable. Accordingly, the Court arrives at a "lodestar" figure of $191,009.

After the lodestar is determined, the Court may adjust the award of attorneys' fees. In this regard, the Court notes the excellent results obtained by Inmuno Vital's counsel in prevailing on all of its claims and on Nutrivida's claims. The Court also notes the partial contingency nature of the fee agreement between Inmuno Vital and its counsel. Based on these factors, the Court finds that an upward enhancement of two (2) times the lodestar amount is warranted. *See FIGA v. RVMP Corp.*, 681 F.Supp. 806, 808 (S.D.Fla.1988). Accordingly, the Court finds the reasonable attorneys' fee award in this case to be $382,018.

Section 1117(a) of the Lanham Act also supports an award of costs and expenses to Inmuno Vital. Accordingly, the Court has reviewed Inmuno Vital's submissions regarding its costs and expenses incurred in this litigation, which amounted to $28,959. The Court finds that each such charge was necessary to the effective and efficient prosecution of the action, and further that the amount of the charges is reasonable for a case of this complexity and duration

## VII.  INJUNCTIVE RELIEF

Injunctive relief for violations of 15 U.S.C. § 1125(a) is provided for by 15 U.S.C. § 1116(a). Under the circumstances of this case, particularly the nature of the past violations, the Court finds that a permanent injunction is warranted in order to reduce the threat that Nutrivida will resume its infringing activities. An appropriate injunction will be entered accordingly.

## VIII.  CONCLUSION

The Court ORDERS AND ADJUDGES that Nutrivida shall pay to Inmuno Vital its gross profits of $10,524,111, punitive damages of $1,500,000, prejudgment interest of $2,607,109, and Inmuno Vital's attorneys' fees and costs of $410,977, for a total award of $15,042,197. Final Judgment shall be entered in accordance with this opinion.

DONE AND ORDERED.