ADT SECURITY SERVICES, INC., APPELLEE AND CROSS-APPELLANT, v. A/C SECURITY SYSTEMS, INC., AND TROY D. BAUMERT, APPELLANTS AND CROSS-APPELLEES, AND DAVID W. BAUMERT, APPELLEE.

736 N.W.2d 737

Filed July 3, 2007. No. A-05-379.

668

Larry E. Welch, Sr., and Larry E. Welch, Jr., of Welch Law Firm, P.C., for appellants.

Duane C. Dougherty for appellee ADT Security Services, Inc.

IRWIN and SIEVERS, Judges, and HANNON, Judge, Retired.

SIEVERS, Judge.

This is a deceptive trade practice and trade name infringement case. A/C Security Systems, Inc. (Old A/C Security), was sold in 1997, and one of the stockholders, Troy D. Baumert (Troy), received his payment in 1997. In 2001, Troy started

a new corporation using the same name; such company, for clarity, will be henceforth referenced as "New A/C Security." ADT Security Services, Inc. (ADT), effectively acquired Old A/C Security through a series of transactions, and in November 2001, ADT brought this action for injunctive relief and damages against New A/C Security, Troy, and David W. Baumert (David). The district court for Douglas County granted ADT a temporary injunction in April 2002. After a bench trial, the district court found that ADT had not abandoned the disputed trade name, ordered that the causes of action against David be dismissed with prejudice, and found that New A/C Security and Troy (hereinafter collectively Defendants) had violated ADT's common-law right to a trade name/service mark and violated the Uniform Deceptive Trade Practices Act (UDTPA), Neb. Rev. Stat. §§ 87-301 to 87-306 (Reissue 1999 & Cum. Supp. 2006). The district court enjoined Defendants from using the name "A/C Security" until November 28, 2005, and ordered them to pay $88,972.27 in damages, but the court denied ADT's request for attorney fees. Defendants appeal, and ADT cross-appeals. We affirm.

## I. FACTUAL BACKGROUND

Old A/C Security was initially incorporated with the Secretary of State of Nebraska on November 1, 1982. It was a closely held corporation with most of its stock owned and held by David and his family, including his son, Troy. Old A/C Security sold and installed security alarm systems for homes and businesses, monitored the alarm systems, installed communication and home entertainment systems, and sold and installed lightning protection systems. Old A/C Security entered into alarm monitoring agreements with an indeterminate term, but after being sold in 1997, Old A/C Security entered into alarm monitoring agreements typically with 3-year or 5-year terms, depending upon the agreement. Such agreements would automatically renew for another year if neither party discontinued the agreement. Under the alarm monitoring agreements, the customers paid a monthly fee, referenced in the industry as monthly recurring revenue (MRR). MRR is the industry's "bread and butter."

With this background in place, we trace the transactions involving Old A/C Security. MidAmerican Capital Company (MCC), a wholly owned subsidiary of MidAmerican Energy Holdings Company, became the parent company of Old A/C Security through a stock purchase agreement dated December 18, 1997. The day prior to the execution of the stock purchase agreement, Troy and David each entered into an employment agreement with Old A/C Security which contained noncompetition provisions stating in part:

> **Non-Competition.** The Employee agrees that at all times during the term of his employment hereunder and for a period of three (3) years after the termination of this Agreement, he will not (1) directly or indirectly induce any customers of the Company to patronize any competing business; (2) canvass, solicit or accept any security and/or lock services related business relationship from any customers of the Company; or (3) directly or indirectly request or advise any customers of the Company to withdraw, curtail or cancel such business with the Company.

Under the stock purchase agreement, MCC paid a total of $3 million, of which Troy received $17,500 for his shares of stock. Troy and David continued to work for Old A/C Security, which was held by MidAmerican Security Company (MSC), a subsidiary of MCC, and which was operating under the name "A/C Security Systems."

On March 6, 2000, MCC sold all of its interest in the stock of MSC and its subsidiary Old A/C Security to Signature Security Systems, Inc. (SSS). In April 2000, MSC changed its name to Cambridge Security Systems, Inc. (Cambridge). David retired in the summer of 2000, but Troy continued to work for Cambridge. Cambridge honored the Old A/C Security contracts with customers, including the alarm monitoring agreements. In June 2000, a Domestic Corporation Occupation Tax Report was filed with the Nebraska Secretary of State on behalf of Old A/C Security for the calendar year commencing January 1, 2000.

In July 2000, Bob McBroom began working for Cambridge as the director of business development. In August 2000, Robert Gaucher began working for Cambridge as the vice president of operations. Both McBroom and Gaucher knew and worked with

Troy, who was then the Omaha general manager for Cambridge. According to Gaucher and McBroom, Cambridge had acquired other companies in the "burglar alarm business" in addition to Old A/C Security. According to Gaucher, who was responsible for the day-to-day operations of Cambridge, Cambridge sent a letter to the Old A/C Security customers informing them that their accounts had been bought by Cambridge.

Gaucher explained that Cambridge had a "roll-up business plan" under which after acquiring companies in the burglar alarm business, it would begin "'rebranding'" those businesses as "Cambridge" following a 6- to 12-month transition period. The rebranding process consisted of having companies acquired by Cambridge operate under the standard rules and procedures as well as under the Cambridge name and brand, which required changing the names on the trucks, uniforms, stationery, and advertising material. According to Gaucher, Cambridge began rebranding Old A/C Security as Cambridge in early 2001.

On October 15, 2000, Cambridge, the parent company of Old A/C Security, adopted the articles of a merger with Old A/C Security. The "Agreement of Merger," which was filed with the Nebraska Secretary of State, provided that on December 14, 2000, Old A/C Security's separate existence would cease and Cambridge, the parent company of Old A/C Security, would continue as the surviving corporation. Part of the "Agreement of Merger" provided that Cambridge owned all the stock of Old A/C Security on the effective date of the merger, December 14, 2000; that Old A/C Security's shares would not be converted, but would be extinguished; and that Cambridge's shares would remain as outstanding shares of the surviving corporation. The "Agreement of Merger" stated in part:

> Upon the merger becoming effective, all the property, rights, privileges, franchises, patents, trademarks, licenses, registrations, and other assets of every kind and description of . . . A/C shall be transferred to, vested in and devolve upon Cambridge, without further act or deed and all property, rights, and every other interest of Cambridge shall effectively be the property of Cambridge.

In January 2001, Cambridge in turn merged with its parent company, "Cambridge Protection Industries, Inc." As part of the

merger, the parent company changed its name to "Cambridge Security Systems, Inc.," which we will continue to reference as "Cambridge." Cambridge operated its Omaha office out of the leased premises formerly occupied by MCC and Old A/C Security. The building has a large sign on its front which reads "A/C Security Systems, Inc." The record reflects that as of 2000, Cambridge entered into 3- and 5-year contracts using Old A/C Security alarm monitoring agreements, and that as of May 25, 2001, Cambridge entered into an alarm monitoring agreement for a 5-year term using an Old A/C Security contract.

ADT, a Delaware corporation licensed to transact business in Nebraska and engaged in the business of selling and monitoring residential and commercial alarm systems throughout the United States, including east central Nebraska, entered the picture in May 2001. On May 16, ADT entered into an agreement to purchase the stock of Cambridge, and that purchase closed effective July 3. The purchase agreement between ADT and Cambridge gave ADT the right to use all "trademarks (whether registered or unregistered), service marks, trade names, services names, brand names, logos, and copyrights" of Cambridge. The purchase agreement included a schedule entitled "Cambridge Trading Name Listing" with Cambridge's owned intellectual property as of May 9. Part of Cambridge's owned intellectual property included the trade name "A/C Security," and the schedule provided that "A/C Security" was "[r]ebranded as Cambridge Security Systems." In the same attachment, there were notes indicating that some names of the owned intellectual property were "not in use," but "A/C Security" was not designated as such.

ADT took over Old A/C Security customer files, which consisted of approximately 4,700 customers, and honored all of the Old A/C Security customer contracts, which included multiyear monitoring agreements. ADT leased the Omaha location formerly occupied by Cambridge, MCC, and Old A/C Security, but operated its security business from a different location in Omaha. ADT retained Old A/C Security's telephone number.

On August 9, 2001, Troy was not selected to be the ADT general manager in Omaha and Troy's employment ended with ADT. Troy was offered an agreement with a general release

and a noncompetition provision in exchange for approximately $60,000, but Troy declined ADT's offer.

Upon inquiry, the Nebraska Secretary of State informed Troy that there was no record of the trade name "A/C Security Systems, Inc." Thus, on August 13, 2001, Troy filed articles of incorporation for "A/C Security Systems, Inc." Thereafter, he conducted business using that name for his new company which we earlier said we would reference as "New A/C Security." Troy hired Old A/C Security employees. David, the initial owner of Old A/C Security and Troy's father, cosigned a line of credit for New A/C Security, solicited Old A/C Security customers, and was on the board of directors of New A/C Security at the outset. Troy placed advertisements in the telephone books for New A/C Security and operated the business from a location in Omaha. On at least one occasion, Troy used Old A/C Security stationery and an envelope with the Old A/C Security address on it that identify the building which at the time was leased by ADT. Some customers and vendors of New A/C Security sent their checks and invoices to ADT's address. New A/C Security utilized the same shape, color, and design of Old A/C Security's decals and yard signs.

In July 2001, ADT sent a letter informing customers that ADT had acquired Cambridge's customers and that beginning September 19, ADT would start servicing their accounts. In December 2001, Cambridge merged into ADT and, as a result, Cambridge ceased to exist as a separate corporation. In a 2003-2004 telephone directory for the area of Omaha, ADT had listed after its name the telephone number of Old A/C Security, which had merged into Cambridge.

From the time that Troy opened New A/C Security in August 2001 until the spring of 2002, approximately 320 Old A/C Security customers canceled their monitoring agreements with ADT and transferred their accounts to New A/C Security. This fact is not disputed by Defendants.

We summarize the foregoing narrative of the significant transactions by the following timeline:

December 1997: Old A/C Security sold its stock to MCC. MCC's subsidiary MSC was the parent company of Old A/C Security.

March 2000: MCC sold its MSC and Old A/C Security stock to SSS.

April 2000: MSC changed its name to Cambridge.

December 2000: Old A/C Security merged with Cambridge, and Old A/C Security ceased to exist as a separate corporation.

July 2001: Cambridge sold its stock to ADT.

August 2001: Troy's employment with ADT ended, and Troy incorporated New A/C Security (roughly 4 years after Troy was paid by MCC for his shares in Old A/C Security).

December 2001: ADT merged with Cambridge, and Cambridge ceased to exist as a separate corporation.

## II. PROCEDURAL BACKGROUND

On November 28, 2001, ADT filed a petition against Defendants, and on February 28, 2002, a second amended petition was filed seeking injunctive relief and damages for infringement of a trade name and deceptive trade practices, among other claims. In Defendants' answer, they alleged that Cambridge had abandoned the name "A/C Security Systems, Inc." before the sale of its business and assets to ADT and Defendants admitted that they had contacted ADT customers. Defendants cross-petitioned, requesting the court to determine that ADT had no legal claim or right to the name "A/C Security Systems, Inc."

On April 1 through 3, 2002, the district court held a hearing on the motion for a temporary injunction. The district court granted the temporary injunction on April 16 by enjoining Defendants "from using the trade name 'A/C Security' in any manner to solicit or operate its business." In the district court's written findings, the court found that Cambridge did not consider the trade name "A/C Security" abandoned when it sold its assets to ADT; that the "length of time in which Cambridge stopped using the A/C name [was] not . . . substantial enough to indicate intent not to resume use"; that the name "A/C Security" which ADT purchased and the name "A/C Security Systems, Inc.," under which Troy incorporated his new business were substantially similar names; and that the name "A/C Security" had not lost its significance as a trade name. ADT was ordered to provide security in the amount of $50,000, which ADT did on April 24, 2002. Defendants then changed the name of New

A/C Security to "Advanced Security Systems" and continued the business as such during the course of this litigation. Defendants were found in contempt of the temporary injunction in August 2002 and October 2003—which we discuss in more detail later.

After the issuance of the temporary injunction, ADT added David as a defendant and amended its petition to allege that Troy and David breached their employment agreements, which had been executed in December 1997. In November 2002, ADT filed a motion for partial summary judgment, and in January 2003, Defendants and David filed a motion for summary judgment. After hearings on December 19, 2002, and February 13, 2003, the district court filed its order on March 14 sustaining summary judgment in favor of Defendants and David with respect to the noncompetition provision, stating that such provision was contrary to public policy and void. The court also entered judgment for Defendants and David on ADT's misappropriation of trade secrets claim. The district court overruled the remaining aspects of the motions for summary judgment.

The trial was held on December 9 through 12, 2003, and January 7, 2004. ADT asserted three causes of action against Defendants and David at trial: (1) violation of the common-law right to trade name and/or service mark, (2) violation of the UDTPA, and (3) civil conspiracy. Defendants and David asserted in their cross-petition and raised as a defense that they had a superior right to the name "A/C Security."

Gaucher testified that by July 2001, when ADT acquired Cambridge, the rebranding process of Old A/C Security by Cambridge was "60 percent" complete, such that the vehicles had been repainted and rebranded and the new uniforms, stationery, printed matter, and decals had been delivered. However, he testified that the advertising, marketing material, additional telephone directory advertisements, and changing of the sign on the Cambridge-leased building in Omaha was not yet completed. Gaucher explained that Cambridge left the Old A/C Security name and telephone number in the telephone book the first year after Cambridge acquired Old A/C Security. With respect to the vehicles, Troy testified that not all of them had been repainted or rebranded.

McBroom also testified that Cambridge still had the Old A/C Security sign on the front of its Omaha building in July 2001 and that because Cambridge was a new company, it took time to create and disseminate signs, stickers, and uniforms as well as to write new contracts bearing the Cambridge name. The record reveals that as late as May 2001, 5-year contracts bearing the name "A/C Security" were still being executed. The record further reveals that the Omaha telephone books for 2000-2001 and 2001-2002 contained listings using the name "A/C Security" with Cambridge's address and telephone number in them. While Gaucher and McBroom stated that it was Cambridge's intent to not use the name "A/C Security" and to rebrand everything using the name "Cambridge," the record reveals that Cambridge honored and did not rewrite preexisting Old A/C Security customer contracts, including multiyear monitoring agreements which generated MRR for Cambridge.

Mary Rice, ADT's administrative manager in Omaha, also testified. According to Rice, ADT honors approximately 4,700 Old A/C Security alarm monitoring agreements, which generate a total of over $80,000 in MRR for ADT.

On January 22, 2004, ADT filed an application to show cause why Defendants and David should not be held in contempt. After a hearing on February 6, the district court found Defendants in contempt of court for the third time. On February 19, Defendants and David filed an appeal of the contempt order to this court. On November 29, the parties filed a stipulation for dismissal of the appeal in case No. A-04-258, and we dismissed the appeal on December 3.

On January 18, 2005, the district court filed its 30-page "Memorandum Opinion and Judgment" (opinion), and the court's comprehensive and detailed work is noteworthy. As the district court clearly set forth, this case is primarily a deceptive trade practice and trade name infringement case. We note that at the close of evidence, ADT made a motion to conform the pleadings to the evidence and add the claim that the name "A/C Security" was also a service mark, which motion the district court granted. For purposes of this appeal, we will treat the alleged trade name and service mark as one and the same in our analysis by referring to them as "trade name/service mark" or

some other similar derivative when applicable. In summary, the district court found that (1) ADT met its burden of proving both a violation of its common-law trade name/service mark rights to the name "A/C Security" and violations of the UDTPA, (2) Defendants were jointly liable to ADT for monetary damages, (3) ADT was entitled to an injunction prohibiting Defendants from using the name "A/C Security" until November 28, 2005, (4) ADT did not prove a civil conspiracy, (5) David was not individually liable, (6) Defendants' counterclaim was dismissed, and (7) attorney fees for ADT were not appropriate. Also as part of the January 18 opinion, the district court incorporated its March 14, 2003, order finding that Defendants were entitled to summary judgment on ADT's claims of misappropriation of trade secrets and breach of employment agreements. The district court also ordered that the bond posted by ADT would be exonerated and released.

On January 24, 2005, ADT filed a motion for new trial and further review regarding damages, attorney fees, the length of the injunction, the finding that David was not personally liable, and the grant of the summary judgment with respect to the non-compete agreements. A hearing was held on February 14, 2005, and on February 24, the district court overruled the motion for new trial.

Defendants filed a timely appeal, and ADT cross-appealed. Additional facts, particularly concerning damages, will be set forth as needed in our analysis.

### III. ASSIGNMENTS OF ERROR

Defendants allege, restated and reordered, that the district court erred in (1) finding that ADT owned and was entitled to trade name protection of the name "A/C Security Systems"; (2) finding that ADT was entitled to a temporary and permanent injunction; (3) exonerating ADT's undertaking entered to effectuate the temporary order before a final, unappealable order in its favor was entered; and (4) "awarding damages of $88,9[72].27."

In ADT's cross-appeal, it alleges, restated, that the district court (1) erred by awarding an inadequate amount of damages, (2) abused its discretion when it failed to award attorney fees to

ADT, and (3) erred in refusing to enforce the noncompete agreements against Troy and David.

## IV. STANDARD OF REVIEW

To determine the appropriate standard of review for this appeal, it is necessary to determine whether a claim or a counterclaim is an action at law or an action sounding in equity. See *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). The nature of an action, whether legal or equitable, is determinable from its main object, as disclosed by the averments of the pleadings and the relief sought. *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001). Although in many contexts the traditional distinctions between law and equity have been abolished, whether an action is one in equity or one at law controls in determining an appellate court's scope of review. *Dillon Tire, Inc. v. Fifer*, 256 Neb. 147, 589 N.W.2d 137 (1999).

An appellate court reviews a claim or counterclaim that sounds in equity de novo on the record, subject to the rule that where credible evidence is in conflict on material issues of fact, the appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. See *Smith v. City of Papillion*, 270 Neb. 607, 705 N.W.2d 584 (2005). On review of a claim or counterclaim, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. See *Webb v. American Employers Group*, 268 Neb. 473, 684 N.W.2d 33 (2004). The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Henriksen v. Gleason*, 263 Neb. 840, 643 N.W.2d 652 (2002).

ADT sought an injunction and damages for Defendants' violation of the UDTPA and violation of the common-law right to the trade name "A/C Security." Defendants cross-claimed and asked the district court to enjoin ADT from claiming or using the name "A/C Security." Both sides sought equitable relief, and the pleadings and the nature of the case suggest that the

"main objective" of the case was equitable relief with respect to the use of the name "A/C Security." The fact that ADT sought damages does not change the essential character of the action. ADT and Defendants both assert in their briefs that this action was equitable in nature and that the scope of review is de novo on the record. We agree and apply a de novo standard of review to the substantive assignments of error regarding the common-law trade name infringement cause of action. On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. *Channer v. Cumming*, 270 Neb. 231, 699 N.W.2d 831 (2005).

■ We take note of *Goeke v. National Farms, Inc.*, 245 Neb. 262, 512 N.W.2d 626 (1994), a case in which landowners brought a nuisance action seeking both injunctive relief and monetary damages against a nearby hog-raising facility. The district court in *Goeke, supra*, granted injunctive relief with respect to the offensive odors produced by the facility, as well as monetary damages. The Supreme Court upheld the trial court's decision, stating the following:

> We are mindful that the standard of review applicable in reviewing questions of fact is de novo. However, when questions of fact involve the assessment of money damages, an appellate court will not set aside such judgment if it is within the range of the evidence and is not arbitrary.

*Id.* at 267, 512 N.W.2d at 630, citing *Botsch v. Leigh Land Co.*, 205 Neb. 401, 288 N.W.2d 31 (1980).

Because this action seeks injunctive relief and damages, we apply the same standard of review as set forth in *Goeke, supra*.

## V. ANALYSIS

### 1. DEFENDANTS' APPEAL

#### (a) Protection of Trade Name "A/C Security"

■ In a case for trade name infringement, the plaintiff has the burden to prove by a preponderance of the evidence the existence of (1) a valid trade name entitled to protection and (2) a substantial similarity between the plaintiff's and the defendant's names, which would result in either actual or probable deception

or confusion by ordinary persons dealing with ordinary caution. *Nebraska Irrigation, Inc. v. Koch*, 246 Neb. 856, 523 N.W.2d 676 (1994).

### (i) Was "A/C Security" Valid Trade Name Entitled to Protection?

■■■■ Under Neb. Rev. Stat. § 87-128 (Cum. Supp. 2006), a service mark and trade name are defined as follows:

(8) Service mark means any word, name, symbol, or device or any combination thereof used by a person, to identify and distinguish the services of one person, including a unique service, from the services of others, and to indicate the source of the services, even if that source is unknown. Titles, character names used by a person, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor;

(9) Trade name means any name used by a person to identify a business or vocation of such person.

The record reflects that Old A/C Security was initially incorporated in 1982. After 15 years of operating under the name "A/C Security Systems, Inc.," and establishing substantial goodwill in Nebraska in the security business, Old A/C Security was purchased by MCC for $3 million. In March 2000, SSS, which later became Cambridge, purchased MCC. The purchase agreement between MCC and Old A/C Security included provisions addressing trade names; the purchase agreement between MCC and Cambridge included a list of the owned subsidiaries, which list contained the name "A/C Security Systems, Inc."; and the purchase agreement between ADT and Cambridge included a list of intellectual property, which list contained the name "A/C Security." However, the aforementioned purchase agreements do not refer specifically to the goodwill of the trade name "A/C Security." Nevertheless, the presumption is that it was the intention of the parties that the goodwill should pass with the other assets. See, e.g., *Gable v. Carpenter*, 136 Neb. 669, 287 N.W. 70 (1939) (noting generally accepted principle that even where contract for sale and transfer of business omits to mention goodwill, presumption is that it was intention of parties that goodwill should pass with other assets).

After our review of the record, the evidence presented established that the phrase "A/C Security" is both a trade name and a service mark under Nebraska law—a point which Defendants do not contest. Even though ADT purchased the trade name "A/C Security" in the "Agreement of the Purchase and Sale of Stock" between Cambridge and ADT, it is also apparent that ADT also acquired the trade name "A/C Security Systems," and the trade names "A/C Security" and "A/C Security Systems" will hereinafter be used interchangeably.

Defendants allege in their assignments of error that the district court erred in finding that ADT owned and was entitled to trade name protection of the name "A/C Security Systems." Defendants argue that ADT did not establish an intent to use such trade name in the marketplace to distinguish its business from others in the same market and that such trade name was abandoned by Cambridge. The issue of whether ADT intended to use such trade name and whether that trade name was abandoned by Cambridge relates to the first component of a trade name infringement prima facie case—whether a trade name is entitled to protection.

The Nebraska Supreme Court in *White v. Board of Regents*, 260 Neb. 26, 614 N.W.2d 330 (2000), discussed how to establish a legally protectable common-law interest in a trade name and adopted the common-law definition for "use" of a trade name as set forth in Restatement (Third) of Unfair Competition § 18 at 184 (1995), which provides: "A designation is 'used' as a . . . trade name . . . when the designation is displayed or otherwise made known to prospective purchasers in the ordinary course of business in a manner that associates the designation with the goods, services, or business of the user . . . ." The Supreme Court in *White* said, "At common law, the use of a trade name may be established by its appearance on signs, documents employed in conducting business, mail solicitations, or advertising." 260 Neb. at 37, 614 N.W.2d at 338.

We recall at the outset that the record establishes that Cambridge merged with Old A/C Security in December 2000, whereby Old A/C Security ceased to exist as a separate corporation. However, merely because a corporation merges into

another corporation does not lead to the conclusion that the surviving corporation does not have the right to use the trade name of the now nonexistent corporation. To the contrary, when two or more corporations effect a merger or consolidation, the surviving corporation possesses "'all the rights, privileges, immunities, and franchises,'" as well as all the property—real, personal, and mixed, including the debts—of each of the merging corporations, and "any interest . . . vested in any of such corporations shall not revert or be in any way impaired by reason of such merger." *Kimco Addition v. Lower Platte South N.R.D.*, 232 Neb. 289, 296, 440 N.W.2d 456, 461 (1989). Cambridge, as the surviving corporation in the merger, would have clearly acquired the trade name "A/C Security" and the right to use it. It is obvious from the record and neither party disputes that in the spring of 2001, Cambridge used the trade name "A/C Security" by displaying it—for example, on signs and documents.

Nonetheless, Defendants argue that after Cambridge acquired Old A/C Security, Cambridge immediately began a process of rebranding the trade name "A/C Security." Defendants allege that such rebranding led to Cambridge's abandonment of the trade name "A/C Security" and that such abandonment was complete at the time ADT acquired Cambridge.

For purposes of the Trademark Registration Act, Neb. Rev. Stat. §§ 87-126 to 87-144 (Cum. Supp. 2006), in order for a mark to be considered "abandoned," either of the following has occurred:

> (a) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall constitute prima facie evidence of abandonment; or
>
> (b) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to lose its significance as a mark.

§ 87-128(1). These statutory hallmarks of an "abandoned mark" are consistent with the Restatement (Third) of Unfair Competition § 30 at 308 (1995), which provides:

> (1) In an action for infringement of a trademark, trade name, collective mark, or certification mark, it is a defense

that the designation was abandoned by the party asserting rights in the designation prior to the commencement of use by the actor.

(2) A trademark, trade name, collective mark, or certification mark is abandoned if:

(a) the party asserting rights in the designation has ceased to use the designation with an intent not to resume use; or

(b) the designation has lost its significance as a trademark, trade name, collective mark, or certification mark as a result of a cessation of use or other acts or omissions by the party asserting rights in the designation.

As said earlier, the merger of Old A/C Security into Cambridge did not, standing alone, result in Cambridge's abandoning the trade name "A/C Security." As a result, the next question is whether Cambridge's process of rebranding or changing of the trade name "A/C Security" to reflect Cambridge resulted in an abandonment of the trade name by Cambridge.

Defendants did not identify an exact date when Cambridge allegedly abandoned the trade name "A/C Security," but in Defendants' reply brief, they alleged that the sale of Cambridge to ADT "expressed the completed abandonment" of the trade name. Reply brief for appellants at 5. To constitute abandonment under the above authority, either Cambridge had to cease using the trade name with the intent not to resume use or the trade name had to have lost its significance as a result of a cessation of use, irrespective of intent.

In this particular case, the record reflects that Cambridge intended to use one name, "Cambridge," when soliciting new customers and entering into new contracts with customers and not the name "A/C Security." However, the record also contains evidence that the process of rebranding the trade name "A/C Security" was only 60 percent complete in July 2001. At that time, Cambridge still had the Old A/C Security sign on the building Cambridge was using and had telephone book listings under the name "A/C Security." Cambridge was also using the Old A/C Security telephone number and vehicles with the name "A/C Security" on them. Plus, Cambridge had thousands of contracts in effect under the name "A/C Security," which

contracts were producing very substantial MRR for Cambridge. In the record, there is evidence that Cambridge executed an Old A/C Security contract on May 25, 2001, with a term of 5 years, which date was a little over a month before ADT purchased Cambridge. Thus, the record shows that before ADT acquired Cambridge, Cambridge did not cease using the trade name "A/C Security" nor did such trade name lose its significance as a result of a cessation of use.

Therefore, because Cambridge had not abandoned the trade name "A/C Security" through its rebranding process, which was clearly incomplete, and because Cambridge was actively using such trade name while conducting its business, ADT acquired the trade name "A/C Security" in July 2001 as provided for in the purchase agreement, which specifically provided for the transfer to ADT of intellectual property, including the name "A/C Security." We find that the defense of abandonment fails.

Defendants' remaining argument or defense can be summarized as follows: Because ADT did not do business using the name "A/C Security" after ADT acquired Cambridge and never intended to do business as such, ADT does not have a legally protectable common-law interest in the trade name "A/C Security."

ADT owned the trade name/service mark "A/C Security" as the ultimate successor in interest from the original sale of Old A/C Security in 1997, and the "maximum reach" of ADT's position in this respect "could be no better than that of its predecessors in interest." See *Ransdell v. Sixth Street Food Store*, 174 Neb. 875, 884, 120 N.W.2d 290, 295 (1963). Similarly to Cambridge, ADT honored the Old A/C Security contracts, which included approximately 4,700 monitoring agreements that generated over $80,000 of MRR; assumed Cambridge's lease of the Old A/C Security building in Omaha; maintained the Old A/C Security sign on the building; and retained the Old A/C Security telephone number. ADT acknowledges that it did not advertise or market to the general public by using the trade name "A/C Security" and does not intend to do so. Nonetheless, despite its future intentions, the fact is that under Nebraska's definition of "use" of a trade name, ADT did use the trade name "A/C Security" in its business after it acquired Cambridge.

■ Therefore, to summarize, the evidence shows that Cambridge did not abandon the trade name "A/C Security," that Cambridge sold it to ADT, and that ADT made use of such trade name in its ordinary course of business. ADT received considerable goodwill from the acquisition of Cambridge, which in reality flowed in part from the trade name "A/C Security," and ADT maintained the association with the name "A/C Security" by continuing to honor all Old A/C Security contracts and by receiving MRR of approximately $80,000 from such contracts. The fact that Defendants had subsequently registered the trade name "A/C Security" with Nebraska's Secretary of State after Cambridge was acquired by ADT does not adversely affect ADT's rights acquired in good faith at common law. See Neb. Rev. Stat. § 87-218 (Reissue 1999). See, also, *Ransdell, supra.* Thus, we conclude that ADT had a legally protectable common-law interest in the trade name "A/C Security," and Defendants' arguments to the contrary are without merit.

### (ii) Was There Actual or Probable Deception or Confusion Between Names?

■ Because ADT had a legally protectable common-law interest in the trade name "A/C Security," the next analytical step is to determine whether Defendants infringed upon ADT's trade name "A/C Security." The key concept is that "the evil sought to be eliminated by trade name protection is confusion." *Dahms v. Jacobs*, 201 Neb. 745, 746, 272 N.W.2d 43, 44 (1978). The burden is upon the plaintiff to show whether the likelihood of such confusion exists. See *id.* "The likelihood of confusion in the use of trade names can be shown by presenting circumstances from which courts might conclude that persons are likely to transact business with one party under the belief they are dealing with another party." *Nebraska Irrigation, Inc. v. Koch*, 246 Neb. 856, 861, 523 N.W.2d 676, 680 (1994). However, the potential for confusion in the present case does not rest on similarity of names, as in *Nebraska Irrigation, Inc., supra,* where the "dueling" trade names were "Nebraska Irrigation" and "Nebraska Irrigation Sales & Equipment." Rather, the confusion in the present case arises from two business entities using the same name when one of them, ADT, has a protectable interest in the trade name at issue, "A/C Security."

█ No precise rules can be laid down to determine whether trade name confusion exists or is likely to arise. Among the considerations are

(1) degree of similarity in the products offered for sale; (2) geographic separation of the two enterprises and the extent to which their trade areas overlap; (3) extent to which the stores are in actual competition; (4) duration of use without actual confusion; and (5) actual similarity, visually and phonetically, between the two trade names.

*Equitable Bldg. & Loan v. Equitable Mortgage*, 11 Neb. App. 850, 861, 662 N.W.2d 205, 214 (2003).

First, the degree of similarity in the product and service offered for sale by both ADT and New A/C Security is obviously substantial. The record establishes that ADT—which owns the Old A/C Security contracts, agreements, and warranties—and New A/C Security both sell, install, and monitor residential and commercial security systems.

Second, the two enterprises are not geographically separate. The record established that ADT leases the building in Omaha formerly occupied by Cambridge, MCC, and Old A/C Security; that such building has a large sign bearing the name "A/C Security" on the outside; and that the building with the sign is within 15 blocks of New A/C Security's building, which also had the name "A/C Security" on the outside. Both ADT and New A/C Security operate in Omaha and in east central Nebraska. Thus, while ADT is a nationwide enterprise and New A/C Security operates largely in Omaha, for purposes of this case, their trade areas overlap.

Third, as might be expected as a consequence of the overlap of ADT's and New A/C Security's trade areas and the fact that the companies are in the same business, the record establishes that ADT and New A/C Security are in direct competition with each other. ADT's district general manager testified that ADT and New A/C Security were in direct competition. Troy also admitted at the temporary injunction hearing that New A/C Security competed directly with ADT. The evidence establishes that ADT and New A/C Security compete for the same customers, as clearly shown by the undisputed fact that approximately 320 customers have abandoned their Old A/C

Security contracts, thereby leaving ADT to do business with New A/C Security.

The fourth factor is the duration of use without actual confusion. Prior to the entry of the temporary injunction, the record demonstrates that from August 2001, when Troy incorporated New A/C Security, until April 2002, when the district court granted the temporary injunction enjoining Defendants from using the trade name "A/C Security," vendors and customers sent invoices and checks that were intended for New A/C Security to ADT. The administrative manager for ADT in Omaha testified that the Internal Revenue Service sent ADT materials intended for New A/C Security and that customers telephoned ADT complaining of being double-billed by ADT and New A/C Security. Clearly, ADT established that actual confusion existed.

Fifth, confusion can necessarily be inferred from the fact that Troy incorporated and operated New A/C Security using the same name as Old A/C Security and that the name is clearly substantially similar to the trade name "A/C Security" which ADT owned, was using, and for which it was entitled to legal protection.

After consideration of these five factors, the record shows that ADT met its burden of proof, by a preponderance of the evidence, that either actual or probable confusion in the use of the trade names existed.

In summary, in this case of trade name infringement, ADT met its burden of proving both that the name "A/C Security" is a valid trade name entitled to protection and that a substantial similarity existed between the trade name and Troy's new corporation, so that there was either actual or probable deception or confusion by ordinary persons dealing with ordinary caution. Defendants' first assignment of error is without merit.

(b) Uniform Deceptive Trade Practices Act and Injunctions

■ Defendants failed to separately assign as error the district court's finding that Defendants violated the UDTPA, specifically § 87-302. Nonetheless, Defendants argue:

The Court concludes that [Defendants] were guilty of deceptive trade practices in that ". . . they solicited many

of their customers by creating the impression that it was the old A/C, that it was back in business, and that it had acquired the name/service mark and goodwill of the old A/C company." [Defendants] respectfully suggest that the record does not support such a broad, general conclusion and the evidence does not reach the level of deceptive trade practice.

Reply brief for appellants at 7. Errors not assigned in an appellant's initial brief are waived and may not be asserted for the first time in a reply brief. *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001). To the extent that Defendants seek to introduce a new assignment of error in their reply brief, such attempt fails, and we do not address the above-quoted claim.

 Defendants did assign as error the claim that the district court wrongfully entered the temporary injunction of April 2002 as well as the final injunction entered in January 2005. However, it is not within the province of this court to determine moot questions. *State ex rel. Douglas v. Ledwith*, 204 Neb. 6, 281 N.W.2d 729 (1979). Where there is a final judgment against the party enjoined, the temporary injunction merges into the final decree and any questions concerning the propriety of the issuance of the temporary injunction become moot. *Id.* A moot case is one which seeks to determine a question in which the issues presented are no longer alive. *Hron v. Donlan*, 259 Neb. 259, 609 N.W.2d 379 (2000). The April 2002 temporary injunction order merged into the January 2005 final judgment, which included a finding that Defendants should be enjoined from using the name "A/C Security" in any manner until November 28, 2005. The parties filed their briefs prior to November 28, but neither party discussed mootness. Nonetheless, the final injunction has now expired by the passage of time, and it is no longer effective or "alive." Thus, the matter of the entry of the injunctions is moot.

 However, the public interest exception to the mootness doctrine is well established. See *Hauser v. Hauser*, 259 Neb. 653, 611 N.W.2d 840 (2000) (moot issues may be addressed by appellate court when claims presented involve matter of great public interest or when other rights or liabilities may be affected by case's determination). In determining whether the

public interest exception should be invoked, we consider the public or private nature of the question presented, the desirability of an authoritative adjudication for future guidance of public officials, and the likelihood of future recurrence of the same or a similar problem. *Id.* The injunctions here were narrow and merely enjoined Defendants from using a specific trade name. Defendants were not enjoined from competing in the security business under a different name, which Defendants did immediately after the issuance of the temporary injunction in April 2002. Defendants' appeal of the injunction is clearly outside the public interest exception to the mootness doctrine, and we address the injunctions no further.

### (c) Exonerating Bond

Under the district court's order granting the temporary injunction against New A/C Security, ADT provided security in the amount of $50,000. After the trial on the merits, the district court's opinion provided for a final injunction that would expire in November 2005 and exonerated and released the $50,000 bond posted by ADT. Defendants allege that the district court erred in exonerating ADT's security before a final and unappealable order in ADT's favor was entered. Like the assignment of error regarding the injunctions, we find that the issue of the bond is now moot. Even if the issue was not moot, there can be no liability on the bond when a full trial on the merits results in a final judgment against the party enjoined. *State ex rel. Douglas, supra.* This assignment requires no further discussion.

### 2. DAMAGES

Having concluded that Defendants infringed upon ADT's common-law rights to the trade name "A/C Security," we turn to the assignments of error in Defendants' appeal and ADT's cross-appeal with respect to damages. As stated above, we review the trial court's factual findings under a clearly erroneous standard of review. *Webb v. American Employers Group,* 268 Neb. 473, 684 N.W.2d 33 (2004). And, we affirm the trial court's damage award unless it is arbitrary and outside the range of the evidence. See *Goeke v. National Farms, Inc.,* 245 Neb. 262, 512 N.W.2d 626 (1994). The district court awarded

ADT $88,972.27 in damages. Defendants' assignment of error regarding damages is not particularized, because it simply states: "The Court erred in awarding damages of $88,9[72].27 against the Defendants." Such an assignment could arguably encompass one or more of the following claims: damages were legally impermissible under common law, damages were not proved, or while there was damage, the court's calculation was wrong. Because of the expansive nature of the assignment of error, we have carefully examined Defendants' argument to determine the issue raised. We conclude that the issue raised is whether the proper measure of damages is "pecuniary loss" that ADT proved it suffered from the infringement or whether the measure of damages is an "accounting" of the infringing Defendants' profits.

The heart of Defendants' argument is that ADT was not entitled to recover under the "accounting" method, because ADT had not proved the prerequisites for such method. Defendants' fallback position is that even if accounting was the proper measure of damages, the district court used the wrong time period, and that thus, the damage award should be reduced to $52,522.23.

We must first reach an independent conclusion of law as to whether a party may receive a damage award for a violation of the common-law trade name/service mark. The remedy available in an action is a question of law, not fact. *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003).

It will be helpful in our analysis to detail how the district court arrived at its damage award. Using evidence of New A/C Security's tax returns and profit-and-loss statements for 2001 through the first three quarters of 2003, the district court found that its gross monitoring revenue for such years was $355,899.08. The district court accepted the uncontroverted testimony that New A/C Security's net profit was 25 percent of its gross monitoring revenue, and the district court thus arrived at the sum of $88,972.27 as damages.

The district court correctly noted that the Nebraska appellate courts have not previously addressed the subject of the monetary damages for infringement of a common-law trade name/service

mark. Thus, this is a matter of first impression as to whether damages are appropriate in common-law trade name infringement cases.

 We note that Nebraska's Trademark Registration Act provides:

> It is the intent of the Legislature that the Trademark Registration Act provide a system of state trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the federal Trademark Act of 1946, as amended [Lanham Trade-Mark Act]. To that end, the construction given the federal act should be examined as persuasive authority for interpreting and construing the Trademark Registration Act.

§ 87-127. Looking to federal authority, the Lanham Trade-Mark Act at 15 U.S.C. § 1117(a) (2000 & Supp. IV) provides that a party, such as ADT, can recover the infringer's profits, any damages sustained, and the costs of the action. Therefore, the Lanham Trade-Mark Act provides for an award of damages under a "profits" theory (also referred to as the "accounting" theory) or a "damages" theory (also referred to as the "pecuniary loss" theory). See, also, 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:57 (2007). The trial court has wide discretion in assessing these damages although they may not be susceptible of precise calculation. *Nutrivida, Inc. v. Immuno Vital, Inc.*, 46 F. Supp. 2d 1310 (S.D. Fla. 1998). In *Nutrivida, Inc.*, the court also observed that an award of the infringer's profits has been viewed under the common law as well as under the Lanham Trade-Mark Act as a way of compensating the plaintiff for sales lost to the infringer. The court further stated that the infringer's profits "'are a rough measure of the plaintiff's damages'" and that "'they are probably the best possible measure of damages available.'" 46 F. Supp. 2d at 1315, quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir. 1987). Such an award serves to deprive the infringer of any unjust enrichment and provides a deterrent against similar activity in the future. *Id.* Indeed, absent an award of monetary damages, it is apparent that an infringer can

violate the law of unfair competition and trade name/service mark protection with relative impunity.

Monetary awards for trade name infringement are intended to make it financially futile for a competitor to benefit from another's business identity and to neutralize any financial gain the infringer may realize. See, generally, Restatement (Third) of Unfair Competition §§ 36 and 37 (1995). Whether a monetary award is appropriate in cases of trade name infringement at common law depends upon the particular facts of the case, but even when the infringer acted in good faith, monetary awards may still be recoverable if the trade name owner proves pecuniary harm. See Restatement, *supra*, § 36, comment *g*. These monetary remedies are subject to equitable principles, and the court should consider the particular facts of the case when deciding whether actual damages or accounting of profits is appropriate. Restatement, *supra*, § 36, comment *b*. An award based on the trade name owner's pecuniary loss places the burden of proving actual business damages and the amount of such damages or loss on the trade name owner. Restatement, *supra*, § 36, comment *c*. An award based on the infringer's profits, also referred to as an "accounting," should be reserved for cases in which the infringer engaged in the conduct with the intention of causing confusion or deception. Therefore, it is through the award of damages that the infringer's victim is compensated for its losses, and future infringers are deterred. We hold that an award of monetary damages is an appropriate remedy, in addition to injunctive relief, for infringement of a common-law trade name/service mark.

However, Defendants argue that the infringer's "profits" method of calculating damages cannot be used because of the district court's finding that "'[t]hroughout these proceedings, the Defendants have acted upon a colorable claim that the name/mark had been abandoned and [they] have not acted in bad faith.'" Brief for appellants at 30. But, Defendants misapprehend the meaning of the term "colorable claim" and incorrectly treat this statement from the district court's decision as tantamount to a finding that Defendants' abandonment defense had merit. A "colorable claim" is merely "'a claim that is advanced in good faith on some plausible legal theory.'" *Garcia v. Rubio*, 12 Neb.

App. 228, 237, 670 N.W.2d 475, 482 (2003), quoting *Rogers v. Platt*, 199 Cal. App. 3d 1204, 245 Cal. Rptr. 532 (1988). Thus, the quoted statement by the district court relied upon by Defendants to defeat the damage award is not a factual finding concerning damages, but an observation and rationale which we read as being limited to the district court's rejection of ADT's claim that it should be awarded attorney fees—an issue which is determined on different grounds than the damage issue.

In applying the infringer's "profits" measure of damages, the district court used the Restatement (Third) of Unfair Competition, because the trial court concluded Defendants acted with the intent to cause confusion and deception—the prerequisites for an award based on such methodology. The evidence is abundant that despite selling Old A/C Security and the trade name "A/C Security" for $3 million, Defendants deliberately set upon a course designed to make it appear that Troy and David were "back in business," using the name "A/C Security." The obvious evidence of such course of conduct was the solicitation of their former customers as though Old A/C Security had not been sold. The evidence shows that Defendants succeeded in taking 320 customers from ADT while deceptively using the trade name "A/C Security"—a trade name we have found was ADT's property and protected by the common law of unfair competition. We have previously recited the evidence of confusion, and we will not repeat such here. The district court's prerequisite factual finding for an award of the infringer's profits—intent to cause confusion and deception—is supported by the record and is not clearly erroneous. Therefore, it follows that the district court did not err in applying the infringer's "profits" method of calculating damages.

█ Under the infringer's "profits" method, the trade name owner must prove gross sales or revenue and then the burden shifts to the infringer to prove the proportion of sales or revenue not attributable to the infringement and the costs properly deductible from the gross revenue in calculating the net profit. See Restatement (Third) of Unfair Competition § 37 (1995). See, also, 15 U.S.C. § 1117(c); *Burger King Corp. v. Mason*, 855 F.2d 779 (11th Cir. 1988). While the undisputed evidence shows that Defendants proved that 25 percent of their gross

profits were net profits, Defendants did not carry their burden to show that any proportion of their gross profits during the timeframe used by the trial court to calculate damages were not derived from their illegal activity of infringing ADT's trade name/service mark. Thus, the award of damages of 25 percent of gross profits was appropriate. However, in Defendants' attack on the damage award, they assert that the district court used an improper timeframe in which to calculate the profits.

The district court used gross profits reduced to net profits based on MRR for 2001 through the first three quarters of 2003. However, Defendants argue that the name "A/C Security" was used only from the time of incorporation of New A/C Security until the district court's issuance of a temporary injunction on April 16, 2002—a period of only 8 months. Therefore, Defendants argue that even applying the district court's methodology, the net profit from MRR is only for the 8 months and amounts to $52,522.23. In support of this argument, Defendants refer us to the exhibit which "the parties agreed [is the list of] the 320 former customers of ADT which became customers of the Defendants in the eight-month period prior to the Defendants' name change." Brief for appellants at 31-32.

ADT does not answer this "improper timeframe" argument except to the extent that in its cross-appeal, ADT claims that damages should have been based on the "pecuniary loss" theory which, according to ADT's evidence, should be the "market value" of these 320 customers taken by New A/C Security from ADT. Thus, for efficiency, we now turn to the damage portion of ADT's cross-appeal.

In its written findings, the district court said it was not persuaded that the evidence was sufficient to "award ADT damages based upon a theory of ADT's pecuniary losses," which, according to the district court, would have been the "value" of the 320 accounts that moved from ADT to New A/C Security, based upon a valuation formula used when security alarm companies are sold. That formulation according to ADT's expert is the MRR from the 320 accounts—$7,563.50—multiplied by a factor between 34 to 40, producing a valuation (and damage) figure of $257,159 to $302,540. Rather, the district court used the Restatement (Third) of Unfair Competition § 37 (1995),

which bases an award of damages on net profits if the infringer acted with intent to cause confusion or deception. The district court found that Troy "acted with the intention of causing confusion and there is no doubt that he benefited from the unlawful conduct." Therefore, the district court calculated damages based upon New A/C Security's monitoring income from 2001 ($17,901.37), 2002 ($172,281), and the first three quarters of 2003 ($165,706.71), 25 percent of which sums was the net profit producing the damage award of $88,972.27. We adopt the view that a monetary award based on the infringer's profits can be awarded to prevent unjust enrichment and to deter future infringement of a trade name. See, Restatement, *supra*, § 37, comment *b*. See, also, *Burger King Corp. v. Mason*, 855 F.2d 779 (11th Cir. 1988).

▮ Given that we review factual findings to determine if such were clearly erroneous and the fact that the method of calculating damages under the infringer's "profits" theory is a permissible method of damage calculation, we affirm the district court's calculation of damages. We recognize that the trial court has broad discretion in determining the proper monetary award for infringement of a trade name. See, generally, Restatement, *supra*, §§ 36 and 37. See, also, *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562 (11th Cir. 1986). Given the evidence which we have previously detailed, the district court's damage award was not clearly erroneous from a factual standpoint, nor is it a legally incorrect methodology.

In concluding that the district court's damage calculation was not clearly erroneous, we note that ADT's damage evidence under the pecuniary loss theory has a shortcoming, which is that the evidence of the MRR used in the expert's calculation for the 320 accounts at issue is revealed to be gross revenue and not net revenue, whereas under infringer's profits—an "accounting" theory—the damages were calculated on a net profit basis. This is a key factor because while ADT lost the revenue from the accounts, it also did not have to bear the cost of servicing the accounts. Thus, without this information, the evidence is not persuasive in showing what ADT actually lost, and the figure used by the expert could well have been within a substantial windfall—remembering that other evidence showed

that Defendants' cost of doing business with reference to such accounts was 75 percent of gross revenues. Thus, for this additional reason, the trial court was neither clearly wrong nor arbitrary in declining to use ADT's damage figure calculated under the "pecuniary loss" theory, and the damage award is clearly supported by the evidence.

As to whether the trial court used an improper timeframe by including profits derived after the temporary injunction was entered and Troy changed his company's name, we reject that claim because of the nature of the infringement and the fact that the customers gained by Defendants from the infringement continued to produce MRR for Defendants even after the temporary injunction. In other words, limiting damages to the 8-month time period from when Troy started New A/C Security until the temporary injunction was entered and Troy changed his company's name would not be reflective of what Defendants gained from their infringement, because MRR from those 320 customers obviously continued after the injunction was entered. Accordingly, we affirm the district court's award of damages, reject ADT's cross-appeal with respect to damages, and hold that the trial court did not abuse its discretion when selecting the method of, and time period for, the damage calculation.

We note Defendants contend in their brief that there is no provision for an award of damages under the UDTPA and that the "only relief available for a violation of its provisions is an injunction." Brief for appellants at 26. Having determined that damages were proper under common law and due to the nonparticularized nature of this assignment of error, we need not address whether damages are proper under the UDTPA. See *Castillo v. Young*, 272 Neb. 240, 720 N.W.2d 40 (2006).

### 3. Remaining Issues in ADT's Cross-Appeal

#### (a) Attorney Fees Under UDTPA

ADT alleges that the district court abused its discretion when it failed to award attorney fees to ADT. ADT argues that Defendants' conduct prior to and during the litigation was intentional, willful, and malicious and that ADT should be awarded attorney fees under the UDTPA.

The district court made detailed written findings and concluded that Defendants violated the UDTPA, specifically

§ 87-302(a)(1), (2), and (3), and as said earlier, Defendants have not properly challenged such finding. Section 87-303(b) of the UDTPA directs allowance of costs to the prevailing party "unless the court otherwise directs" and authorizes the court, "in its discretion," to award attorney fees to the prevailing party if the party charged with a deceptive trade practice has "willfully engaged in the trade practice knowing it to be deceptive."

In this case, the district court found that Defendants adopted the same name and identical mark as Old A/C Security to increase their profits by "misleading the public's association of the Defendants' services with the services offered by [ADT], who owns the Old A/C [Security] accounts," directly competed with ADT in the same geographic area by offering similar products to ADT, and "intended [and did] create confusion in order to capitalize on the reservoir of surviving goodwill and name recognition of the Old A/C [Security]." However, as discussed earlier, the district court made a specific finding that Defendants' actions were done under a "colorable claim" of abandonment of the trade name/service mark and of good faith. Thus, while the defense was plausible, the court rejected it in deciding the merits of the case but found such to be a "colorable claim," making an award of attorney fees to ADT inappropriate.

As a general rule, attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Destiny 98 TD v. Miodowski*, 269 Neb. 427, 693 N.W.2d 278 (2005); *Kansas Bankers Surety Co. v. Halford*, 263 Neb. 971, 644 N.W.2d 865 (2002). Under the UDTPA, it is in the discretion of the trial court to award attorney fees to the prevailing party. See § 87-303(b). Additionally, the general rule is that on appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *Rapp v. Rapp*, 252 Neb. 341, 562 N.W.2d 359 (1997).

We note that in addition to finding that Defendants violated the UDTPA, the district court also found Defendants to be in contempt of its April 16, 2002, temporary injunction order three times. On August 29, 2002, the district court entered a contempt order because Defendants had failed to take down

the Old A/C Security sign on the front of New A/C Security's building, but it appears from the record that Defendants purged the contempt by paying $1,000. Then on October 14, 2003, the district court found Defendants in willful contempt of the April 16, 2002, order by failing to cease using the e-mail domain "A/C Security.net" and by failing to take all the steps necessary to make sure that the name "A/C Security" was not listed in the white pages of the telephone book. The district court ordered Defendants to pay $2,000 to ADT in attorney fees for Defendants' willful contempt of court, and there is no further record of any sentencing showing a failure to purge the contempt. Thus, we assume that such amount was paid. Finally, on February 6, 2004, the district court found Defendants in willful contempt of its temporary injunction order for using Old A/C Security decals on the side of a New A/C Security vehicle. The district court ordered that Defendants pay $5,000 to ADT to purge the contempt but denied ADT's request for attorney fees. We assume, for the reasons just stated with reference to the previous contempt, that Defendants paid the $5,000 to purge the contempt. In summary, the district court found Defendants in contempt of its April 16, 2002, temporary injunction order three times, and all three times, Defendants apparently purged the contempts by paying a total of $8,000.

In this case, the district court found that while costs should be awarded to ADT, attorney fees should not be awarded to ADT, even though it prevailed on the deceptive trade practices claim. The district court wrote:

> The Court has carefully considered all of the evidence in this case and is well aware of the numerous hearings held and the conduct of the parties. The Court cannot say that Troy . . . willfully engaged in a deceptive trade practice, knowing it to be deceptive, with the exception of the contempt matters, for which purge amounts have already been imposed. Throughout these proceedings the Defendants have acted upon a colorable claim that the name/mark had been abandoned and have not acted in bad faith. Further, it should be noted that attorneys' fees under the Lanham [Trade-Mark] Act are only awarded in "exceptional cases", 15 U.S.C. §1117(a), and the Court finds that

this case is not "exceptional" within the meaning of the Lanham [Trade-Mark] Act.

After our study of the record, we cannot conclude that the district court abused its discretion by denying ADT's request for attorney fees, given that Defendants were forced to respond via contempt proceedings for its most egregious conduct; that Defendants had a plausible defense, albeit unsuccessful; and that this case is not an exceptional case, bearing in mind the relative standing of Defendants and ADT in the industry.

### (b) Noncompete Agreements

ADT, in its cross-appeal, alleges that the district court erred in refusing to enforce the noncompete agreements that David and Troy entered into in 1997 as a condition precedent to selling Old A/C Security to MCC, the original purchaser, which read:

> **Non-Competition.** The Employee agrees that at all times during the term of his employment hereunder and for a period of three (3) years after the termination of this Agreement, he will not (1) directly or indirectly induce any customers of the Company to patronize any competing business; (2) canvass, solicit or accept any security and/or lock services related business relationship from any customers of the Company; or (3) directly or indirectly request or advise any customers of the Company to withdraw, curtail or cancel such business with the Company.

Under the terms of the stock purchase agreement, MCC paid a total of $3 million. Troy received $17,500 for his shares of stock. Troy and David continued to work for Old A/C Security, which was then a subsidiary of MCC. As we detailed above, ADT was the successor in interest to the original purchaser of Old A/C Security. On March 14, 2003, the district court granted Defendants' motion for summary judgment, finding that the noncompetition provision in the case was contrary to public policy and void because the noncompetition provision's scope was greater than was reasonably necessary to protect the legitimate interests of the buyer. Our standard of review on that issue is that which applies to the review of grants and denials of summary judgment.

Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is

no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Bennett v. Labenz*, 265 Neb. 750, 659 N.W.2d 339 (2003). In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.* A question of law raised in the course of consideration of a motion for summary judgment, as with any question of law, must be decided by the appellate court without reference to the decision of the trial court. See *Essen v. Gilmore*, 259 Neb. 55, 607 N.W.2d 829 (2000).

The pleadings and the evidence did not disclose a genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts, because the pertinent facts were undisputed, which is essentially true of all facts in this case. Accordingly, the issue for this court is whether Defendants were entitled to summary judgment as a matter of law with respect to the noncompetition agreement.

 Because the noncompetition provision was a provision contained in an employment agreement made ancillary to the sale of a business, we remember that "'[c]ourts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment.'" *CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 338, 518 N.W.2d 652, 655 (1994), quoting Restatement (Second) of Contracts § 188, comment *b*. (1981).

> The rationale behind the differential treatment is that in a sale of a business, "[i]t is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do the very thing the contract prohibits."

*H & R Block Tax Servs. v. Circle A Enters.*, 269 Neb. 411, 417-18, 693 N.W.2d 548, 554 (2005), quoting *Swingle & Co. v. Reynolds*, 140 Neb. 693, 1 N.W.2d 307 (1941).

> "The restraint of trade that is permissible in [connection with the sale of goodwill as a business asset] is no greater

than is necessary to attain the desired purpose—the purpose of making good will a transferable asset. It is lawful for the seller to restrict his own freedom of trade only so far as is necessary to protect the buyer in the enjoyment of the good will for which he pays. The restraint on his own freedom must be reasonable in character and in extent of space and time."

*Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 755, 472 N.W.2d 391, 397 (1991), quoting 6A Arthur Linton Corbin, Corbin on Contracts § 1385 (1962). Such a contract is binding unless it contravenes the public interest. *Presto-X Company v. Beller*, 253 Neb. 55, 568 N.W.2d 235 (1997). Regarding the public interest, "[t]he elimination of one competitor from a restricted area for a limited time in the business field . . . does not . . . constitute such a restraint of trade or tendency toward monopoly incompatible with the public interest as to warrant one of the parties to avoid his solemn agreement." *Swingle & Co.*, 140 Neb. at 696, 1 N.W.2d at 309. Given our standard of review, we cannot conclude from the record that the noncompetition provision in the employment agreement made ancillary to the sale of the business was injurious to the public interest.

Our inquiry then turns to whether the noncompetition provision ancillary to the sale of the business is reasonable in both space and time so that it will be no greater than necessary to achieve its legitimate purpose. See *Presto-X Company, supra.* Whether such a covenant not to compete is reasonable with respect to its duration and scope is dependent upon the facts of each particular case. See *id.*

As a preliminary matter, in a case dealing with a noncompetition provision ancillary to the sale of a business, the "customer specific" rule is not applicable. *H & R Block Tax Servs., supra.* Instead, in the case of a noncompetition provision ancillary to the sale of a business, a restraint is enforceable if it is reasonable in both time and scope. *Id.* Here, while the 3-year limitation period after the termination of the employment agreement containing the noncompetition provision appears to be a reasonable and thus enforceable restraint, the noncompetition provision did not contain a limit on the

scope. Therefore, the noncompetition provision as a whole is not an enforceable restraint.

ADT argues that *H & R Block Tax Servs., supra*, stands for the proposition that "a specific geographical area is not required for noncompete restrictions that are ancillary to the sale of a business," brief for appellee on cross-appeal at 45, but we find that this is not what the *H & R Block Tax Servs.* court holds. Rather, that holding specifically requires an analysis of both time and scope, because in that case, the court found that the franchise agreement was analogous to a sale of a business for purposes of determining the enforceability of a posttermination covenant not to compete and that a 1-year duration of a covenant not to compete and a geographic limitation of 45 miles from the city where the franchise was located were reasonable. ADT further argues that this court should consider "blue penciling, or reforming the agreement, so as to make it valid under Nebraska law." Brief for appellee on cross-appeal at 46. However, Nebraska jurisprudence "reflects a consistent refusal to strike or alter the language of an integrated covenant not to compete in order to make it enforceable." *H & R Block Tax Servs. v. Circle A Enters.*, 269 Neb. 411, 416, 693 N.W.2d 548, 553 (2005).

In summary, we find that the noncompetition provision was entered into ancillary to the sale of Old A/C Security, that there were no genuine issues as to any material fact or as to the ultimate inferences which may be drawn from those facts, and that Defendants are entitled to judgment as a matter of law because the noncompetition provision did not contain a geographic restriction. Therefore, the noncompetition provision was unenforceable as a matter of law. This assignment of error is without merit.

## VI. CONCLUSION

For the above-stated reasons, we affirm the district court's findings that ADT owned and was entitled to trade name protection of the name "A/C Security," that the trade name "A/C Security" had not been abandoned, and that Defendants violated ADT's common-law right to the trade name "A/C Security." We find that the assignments of error with respect to the injunctions

and bond are now moot. We further find that the district court did not err in determining ADT was entitled to a monetary award for Defendants' violations of ADT's common-law right to the trade name "A/C Security," such award calculated by using an accounting of the infringer's profits method, and that the time period used by the trial court for such accounting was not incorrect. Regarding the cross-appeal, we find no error in the district court's denial of attorney fees and in the granting of the summary judgment in favor of Defendants regarding the noncompetition agreements.

AFFIRMED.